S92A1349, S92X1367, S93A0031. ZANT v. HILL; and vice versa.
(425 SE2d 858)

HUNT, Presiding Justice.

These three appeals, consolidated for our decision, arise out of the grant of habeas corpus relief in a case in which a death sentence was imposed. The conviction and death sentence were affirmed on direct appeal over ten years ago. See *Hill v. State*, 250 Ga. 277 (295 SE2d 518) (1982). Habeas relief was granted on the ground that Hill's lead attorney labored under a conflict of interest stemming from his representation of both Hill and a state's witness, Wayne Lockette, who was also charged with a crime arising out of the events at issue in Hill's trial. Relief was denied on all other grounds in Hill's petition. Warden Zant, on behalf of the state, appeals from the grant of habeas relief. Hill cross-appeals from the denial of relief on the remaining grounds. (In effect, Hill contends the grant of habeas relief should be affirmed on the ground relied upon by the habeas court or on any other ground.) We reverse the superior court's grant of habeas corpus relief (Case No. S92A1349) and affirm the superior court's rulings regarding Hill's remaining claims (Case Nos. S92X1367 and S93A0031).

1. The crimes for which Hill was convicted arose out of a domestic dispute involving Hill's neighbor and the latter's live-in companion. Police were called to the scene of the disturbance, not far from Hill's residence. The domestic disturbance evolved into a general melee including not only the two original participants, but also members of their families, at least one of whom was armed with a knife, and several bystanders. Hill and his friend Wayne Lockette were in Hill's car drinking and listening to music. One of the persons at the scene of the disturbance went to Hill and asked him to help. According to the trial testimony of both Lockette and Hill, the latter asked his daughter to retrieve his gun. Lockette testified that she returned with a flap-type holster and gave it to Hill. He could not see whether a gun was in the holster. Lockette testified that he then entered the house, only later going to the scene of the disturbance. The flap-type holster Lockette identified at trial fit a .32 caliber pistol that Hill was carrying when he was arrested. It was *not* the murder weapon. Hill testified that his daughter brought out an empty holster and he told her to take it back into the house.

In any event, with or without this holster and/or gun, Hill drove his car to the scene of the disturbance. One of the two police officers asked Hill for help; the other told him to leave. (Hill's brother was a police officer, but Hill himself had a criminal record.) Soon afterward, a series of shots rang out. One of the police officers was killed. An apparently unarmed bystander also was killed. Hill was wounded.

Lockette testified that he did not see who shot because he "hit

the ground" when he heard the first shot. The surviving police officer also failed to see who shot. Most of the other persons at the scene, however, testified that Hill had a gun and fired it. Several of them testified that the gun was a .38 they had seen before in Hill's possession.

Hill left the scene, leaving a trail of blood. Inside his car, which he left at the scene, police recovered a holster into which fit the .38 caliber pistol later positively identified as the murder weapon. The gun was discovered between Hill's home and the woods where the police found him.

Hill was charged with murder. In a separate indictment, Lockette was charged with the offense of hindering the apprehension of a criminal because he "did wipe up blood" in Hill's residence. See OCGA § 16-10-50. The attorneys Hill retained to represent him on the murder charges also represented Lockette on the hindering charge. After Hill was convicted, the charge against Lockette was placed on the dead docket.

2. In *Fleming v. State*, 246 Ga. 90 (1) (270 SE2d 185) (1980), this court adopted a mandatory rule in death-penalty cases that

> where the State seeks the death penalty against any one defendant in a criminal transaction, he and his co-defendants must be provided with separate and independent counsel.

Id. at 93. As the habeas court recognized, *Fleming* "did not decide the precise issue which [Hill] raises." Although Lockette may have been in some sense a co-defendant of Hill (see OCGA § 17-8-4; *Dingler v. State*, 233 Ga. 462 (211 SE2d 752) (1975)), Hill and Lockette were charged with committing different crimes. Only Hill was charged with a capital offense. *Fleming* involved a case in which two defendants were charged with murder and the state sought a death sentence for both. The conflict envisioned in *Fleming* was that since in all likelihood only one of the two was "the actual perpetrator of the murder," id. at 97 (Hill, J., concurring specially), an attorney representing both co-defendants could not freely recommend that either of his clients testify in his own behalf because the testimony of each would probably implicate the other.

The likelihood of a conflict in a case in which only one defendant is charged with a capital felony is not so great as to justify a per se rule. We think the *Fleming* automatic disqualification rule should be limited to cases in which each of two or more defendants is charged with capital felonies arising out of the same criminal transaction or event. The habeas court erred by applying the *Fleming* per se rule to

this case.[1]

3. Of course, conflicts may arise in other cases. Just because a co-defendant (or even a mere witness for the state) is not charged with a capital crime does not necessarily mean that he is not guilty or that a sound defense strategy would not include an attempt to blame him for the capital crime. Obviously, counsel would have a conflict of interest if he represented both a capital defendant and the person the capital defendant claims actually committed the crime.

Hill argues that because his trial attorneys represented Lockette, they failed to attack Lockette's credibility or to suggest him as a possible suspect in the murder.

But, as trial counsel explained, there was no reason to impeach Lockette; his testimony was largely favorable to Hill's case. Contrary to Hill's present contention, Lockette was not the only witness to "place a gun" in Hill's hand before the shooting. Despite repeated questions by the state, Lockette could not testify positively that Hill had a gun; he only saw a holster that Hill's daughter brought out to him.[2] Moreover, Lockette then entered the house, so he could not say whether Hill took the holster to the crime scene. Lockette's testimony on this point was entirely consistent with Hill's. And, on cross-examination, Lockette identified (in defense counsel's words) the "wrong holster," i.e., not the one found in Hill's car at the crime scene.

In addition, Lockette was one of the few people at the scene who did not see Hill shoot a gun. As trial counsel contended in the proceedings below, Lockette's testimony was not unfavorable to Hill's

---

[1] We pretermit whether a *Fleming* issue would be cognizable on habeas. See *Parker v. Abernathy*, 253 Ga. 673 (324 SE2d 191) (1985).

[2] His testimony on this point transpired as follows:
A. He told . . . Anita to bring him his gun.
Q. To bring him his gun?
A. Yes, sir.
Q. Did she bring him his gun?
A. Yes, sir.
Q. Did you see the gun at that time?
A. I couldn't see the gun, but I seen the holster. I can't say it was the gun.
Q. Do you remember what color the holster was?
A. Black.
Q. The gun was in the holster?
A. Well, it was one of those kinds of holsters — it was one of those kinds of holsters that had a little flap on it.
Q. So you could not see the gun real clearly in the holster.
A. No, sir.
Q. But you did see it brought back out to Floyd Hill?
A. Yes, sir.
Q. Who brought it out there?
A. His daughter.
Q. The gun was in the holster?
A. I seen the holster. I can't say that the gun was in there.
Trial transcript at p. 701.

case. There was no reason to impeach him.

There also was no reason to attempt to blame Lockette for the murder. Like Hill, Lockette was not involved in the domestic disturbance. One of trial counsel's arguments at trial was that, unlike a number of other persons at the scene, Hill had no motive to shoot one of the officers. The same argument would have been equally applicable to Lockette. There were plenty of other people at the scene to impeach and to accuse, and Hill's attorney did so.[3] It is doubtful that attempting to accuse Lockette would have been good trial strategy. Certainly, the decision not to accuse Lockette cannot be faulted.[4]

4. We agree with the habeas court that Hill's trial attorneys probably should have informed both Hill and the trial court of their representation of Lockette. However, this "joint" representation was not "*per se* violative of constitutional guarantees of effective assistance of counsel." *Holloway v. Arkansas*, 435 U. S. 475 (98 SC 1173, 1178, 55 LE2d 426) (1978). Hill has not demonstrated that his attorneys "actively represented conflicting interests" or that "an actual conflict of interest adversely affected his lawyer[s'] performance." *Burger v. Kemp*, 483 U. S. 776 (107 SC 3114, 97 LE2d 638) (1987).

5. We reverse the grant of habeas relief on conflict-of-interest grounds (Paragraph 16 of the Order on Petition for Writ of Habeas Corpus). The rulings of the habeas court on all other grounds are affirmed for reasons stated in the court's order.

*Judgment affirmed in Case Nos. S92X1367 and S93A0031. Judgment reversed in Case No. S92A1349. Clarke, C. J., Benham, Fletcher, Sears-Collins, JJ., and Judge W. J. Forehand concur; Hunstein, J., not participating.*

DECIDED FEBRUARY 12, 1993 —
RECONSIDERATION DENIED MARCH 4, 1993.

*Michael J. Bowers, Attorney General, Susan V. Boleyn, Senior Assistant Attorney General, Paula K. Smith, Assistant Attorney General,* for appellant.

*R. C. Cougill, Julius L. Chambers, George H. Kendall III,* for appellee.

---

[3] "Tweet" Saffo, one of the original participants in the dispute, had a criminal record and admitted being in possession of a gun shortly before the incident. There was evidence that Toles, the man shot and killed by the police, had recently fired a gun. Another person at the scene was armed with a butcher knife.

[4] Even now, Hill himself does not contend that Lockette had a gun, and his habeas attorneys have presented no evidence that Lockette was or could have been armed.