Christopher A. BURGER,
Petitioner-Appellee,
Cross-Appellant,

v.

**Ralph KEMP, Warden, Georgia Diagnostic and Classification Center,
Respondent-Appellant, Cross-Appellee.**

No. 81–7419.

United States Court of Appeals,
Eleventh Circuit.

Feb. 5, 1985.

---

Michael J. Bowers, Atty. Gen., of Ga., William B. Hill, Jr., Asst. Atty. Gen., Atlanta, Ga., for respondent-appellant, cross-appellee.

Millard Farmer, Joseph Nursey, Andrea I. Young, Millard Farmer, Pamela L.J. Arangno, Atlanta, Ga., for petitioner-appellee, cross-appellant.

ON REMAND FROM THE SUPREME COURT OF THE UNITED STATES

Before VANCE and JOHNSON, Circuit Judges, and ALLGOOD *, District Judge.

PER CURIAM:

Our previous consideration of the merits of this case resulted in reversal of the district court's grant of a writ of habeas corpus setting aside petitioner's death sentence. *Burger v. Zant*, 718 F.2d 979 (11th Cir.1983). In reaching our decision we adopted the district court's opinion, *Blake v. Zant*, 513 F.Supp. 772 (S.D.Ga.1981), with respect to three issues, including Burger's claim that he had been denied effective assistance of counsel.

The Supreme Court granted certiorari limited to one aspect of that issue, *i.e.*, Burger's claim that his trial counsel failed to investigate, prepare or present evidence for the sentencing phase of his capital trial. The Court concluded that the district court had apparently made a mistake in assessing the evidence on that aspect of the ineffectiveness of counsel issue. *Burger v. Zant*, —— U.S. ——, 104 S.Ct. 2652, 81 L.Ed.2d 360 (1984). It therefore vacated and remanded to this court for reconsideration, particularly in light of *Strickland v. Washington*, 466 U.S. ——, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). —— U.S. at ——, 104 S.Ct. at 2653.

This court retained jurisdiction but remanded to the district court instructing it to extend or revise its findings and, if appropriate, its conclusions and judgment. *Burger v. Zant*, 741 F.2d 1274 (11th Cir. 1984). On remand the district court reexamined Burger's claim and on October 10, 1984, entered its order holding the same to be without merit. A copy of the district court's order is made an appendix to this opinion. Following entry of the district

court's order we allowed counsel to supplement their prior briefs.

 Upon reconsideration, we again adopt the appended order of the district court as our own opinion.

Our previous reversal of the district court's grant of the writ was based on the so called *Stephens* issue. 718 F.2d 981, 982. That issue is no longer before us. On the issue presently before us. we affirm the district court's holding that Burger's petition is without merit. Accordingly, we again remand to the district court with instructions that the writ be denied.

REMANDED with instructions.

## APPENDIX

IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF GEORGIA BRUNSWICK DIVISION

CHRISTOPHER BURGER, Petitioner

v.

WARDEN ZANT, ET AL., Respondents
CV280–114

## ORDER

On limited remand from the Eleventh Circuit Court of Appeals, this Court has before it the task of examining petitioner Christopher Burger's claim that he received ineffective assistance of counsel at his second capital sentencing trial. At that trial, petitioner received a sentence of death.

### I. *Background*

Mr. Burger's crimes, trials, appeals and habeas proceedings are detailed elsewhere in the record of this case. *See Burger v. State*, 242 Ga. 28, 247 S.E.2d 834 (1978) (murder conviction affirmed, sentence vacated, case remanded for resentencing), *Burger v. State*, 245 Ga. 458, 265 S.E.2d 796 (1980) (death sentence affirmed), *cert.*

---

* Honorable Clarence W. Allgood, U.S. District Judge for the Northern District of Alabama sit-

ting by designation.

*denied,* 448 U.S. 913, 101 S.Ct. 31, 65 L.Ed.2d 1175 (1980), *Blake v. Zant,* 513 F.Supp. 772, 787–803 (S.D.Ga.1981) (writ denied as to conviction but granted as to death sentence), *rev'd, Burger v. Zant,* 718 F.2d 979 (11th Cir.1983), *rehr'g en banc denied,* 726 F.2d 755 (11th Cir.1984), *vacated, Burger v. Zant,* —— U.S. ——, 104 S.Ct. 2652, 81 L.Ed.2d 360 (1984) (remanded with instructions), *Burger v. Zant,* 741 F.2d 1274 (11th Cir.1984) (limited remand to district court).

Previously, this Court concluded, *inter alia,* that petitioner was not denied effective assistance of counsel at his second sentencing trial. The Eleventh Circuit affirmed this Court as to this issue and adopted this Court's opinion as its own. *Burger v. Zant,* 718 F.2d at 981. On appeal, the United States Supreme Court vacated the opinion of the Eleventh Circuit and instructed it "to reconsider the effectiveness of counsel's assistance at petitioner's second sentencing and for further consideration in light of *Strickland v. Washington,* 466 U.S. —— [104 S.Ct. 2052, 80 L.Ed.2d 674] (1984)." 466 U.S. ——, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The Supreme Court also noted that this Court may have mistaken the first sentencing transcript for the second sentencing transcript when it considered the reasonableness of counsel's decision not to present character evidence to the resentencing court.

Thereafter, the Eleventh Circuit remanded the case to this Court, with instructions to "address the matter to which specific reference was made by the Supreme Court[.]" 741 F.2d at 1275. The court of appeals also stated that this Court "is not limited to that question and shall make such findings as it deems appropriate in light of the Supreme Court's action." *Id.* at 1275.

## II. *Conclusion*

In its original decision, this Court examined petitioner's "ineffective assistance" argument and enumerated six claims merit-

ing discussion. 513 F.Supp. at 795. In light of the standards announced in *Washington,* this Court affirms its earlier decision as to claims two through four, as well as claim six; they provide no grounds for habeas relief. Claim one will be reexamined *infra.*

### A. *Failure to Present Mitigating Evidence*

Turning to petitioner's fifth claim—that his counsel was ineffective because he failed to present mitigating evidence to the sentencing jury—the Court reviews the standards articulated in *Washington, supra,* and *United States v. Cronic,* —— U.S. ——, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). In *Washington,* the Supreme Court

> [e]stablished a two-prong test for analyzing ... [ineffective assistance] challenges. First, the defendant must establish that his counsel's performance "fell below an objective standard of reasonableness." *Id.* at ——, 104 S.Ct. at 2065. Once that threshold is crossed, the defendant must then demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at ——, 104 S.Ct. at 2068.

*Green v. Zant,* 738 F.2d 1529, 1536 (11th Cir.1984) (hereafter, *Green* ); *see also Smith v. Wainwright,* 741 F.2d 1248 (11th Cir.1984); *Douglas v. Wainwright,* 739 F.2d 531, 533 (11th Cir.1984); *Boykins v. Wainwright,* 737 F.2d 1539 (11th Cir.1984); *Solomon v. Kemp,* 735 F.2d 395 (11th Cir. 1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome [of the trial]." *Boykins,* at 1543, quoting *Washington,* 104 S.Ct. at 2068. "Furthermore, a defendant must satisfy both the performance and prejudice prongs to successfully demonstrate an ineffective assistance claim. [*Washington* ], at ——, 104 S.Ct. at 2069. *Chadwick v. Green,* 740 F.2d 897, 900 (11th Cir.1984) hereafter, *Chadwick.*[1] Courts need not ad-

---

**1.** "In [*United States v.*] *Cronic,* [—— U.S. ——, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984) ], the

dress both of these components "if the defendant makes an insufficient showing on one." *Washington*, 466 U.S. at ——, 104 S.Ct. at 2069, 80 L.Ed. at 699.

In addition, the *Washington* court emphasized that "a substantial burden of proof rests on a defendant who advances such a claim; the challenged proceeding enjoys a 'strong presumption of reliability.' *Id.* at ——, 104 S.Ct. at 2069." *Boykins*, at 1543.

Finally, the Eleventh Circuit noted in *Green* that its

> [o]wn cases have established that '[e]ffective assistance does not mean errorless assistance, nor counsel judged ineffective by hindsight,' *Goodwin v. Balkcom*, 684 F.2d [794,] 804 [(11th Cir. 1982)], and our determination of whether petitioner was denied effective assistance 'must be based on the totality of circumstances in the entire record rather than on specific actions.' *United States v. Gibbs*, 662 F.2d 728, 730 (11th Cir.1981). Thus, even if we agree that any of petitioner's complaints against his counsel is well founded, this does not necessarily mean that constitutionally ineffective assistance has been established.

738 F.2d at 1536.

In its original Order, this Court did review the resentencing record but erroneously cited to the transcript of the first sentencing trial. Accordingly, the Court will again review the second sentencing transcript.

As he did at the first sentencing trial, attorney Alvin Leaphart decided not to direct the jury's attention to character-oriented mitigation evidence at petitioner's second sentencing trial. (Federal Habeas

Hearing Record, hereafter, "R." 34, 73). Although he was aware of the fact that Georgia permits a broad scope of mitigating evidence to be admitted at capital sentencing trials (R. 34, 36), it was Leaphart's judgment "that the best approach was ... to argue the difference in [age between Burger and accomplice Thomas Stevens, as well as] the difference in their participation in the crime." (R. 34). In addition, he sought to "make the District Attorney prove his case[,]" (R. 18) by using the rules of evidence "to prevent [the prosecution] from doing so." (R. 18). The trial record reflects this strategy. *See, e.g.*, Tr. 65, 67, 95–6, 106–7, 109, 111, 117, 136, 180–181, 185–191.

Apparently in recognition of the range of evidence the State is permitted to present at sentencing trials (*see* note 6 *infra*), in addition to the strength of the evidence against his client, Leaphart decided to rely primarily on his closing argument to the jury. In his argument, Leaphart illuminated the acts of co-indictee Stevens[2] and minimized Burger's involvement in the murder and related crimes. He fully emphasized the fact that Stevens was twenty years old at the time of the crime, while Burger was only seventeen; that Stevens, the chief architect of the crimes, had considerable influence over petitioner. (Tr. 251, 253). He enumerated, as he did at the first sentencing trial, the series of criminal acts committed by Stevens in contrast to the relatively fewer acts committed by Burger, who "was only following Stevens." (Tr. 250–255).

Next, Leaphart attempted to stimulate the jurors' religious sensitivities. (Tr. 256). He also argued that an "eye for an eye" was a notion popular with the people of

Court carved out a narrow exception to *Washington's* general rule that a defendant must demonstrate prejudice: a showing of prejudice is not necessary if there are 'circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified.' —— U.S. at ——, 104 S.Ct. at 2046; *see also Washington*, 466 U.S. at ——, 104

S.Ct. at 2065." *Chadwick*, 740 F.2d at 900. Examples of presumed prejudice would include cases where counsel was denied the right of effective cross-examination or where the defendant was denied counsel at a critical stage of the trial. *Id.* No such exception is evident in the instant case.

**2.** Stevens and Burger were tried separately.

Moses and of the old testament, but not with the people of today.[3] (Tr. 257–258).

Leaphart concluded his closing argument by re-emphasizing the contrast between the acts of Stevens and Burger, then asking the jury "[w]hat would Jesus Christ do if he were sitting in our shoes today?" (Tr. 259).

The outline above reflects the best strategy Leaphart felt was available to him. Interviews with Burger (R. 37), Burger's mother (R. 37, 44) and an attorney who had befriended Burger and his mother (R. 44), in addition to his consultation with a psychologist[4] (R. 44, 50) and review of psychologists' reports obtained through Burger's mother (R. 35–36, 44), convinced Leaphart that a more exhaustive investigation into Burger's background would not be a profitable pursuit.[5] He also concluded that presenting background and character evidence to the sentencing jury would have been at best unproductive (R. 34, 52), and at worst, harmful to his client (R. 73).

Leaphart decided to keep his client off the stand for a number of reasons. He testified that he was not able to keep Burger from talking about his crime to others. (R. 65). He believed that Burger enjoyed talking about the crime, *id.*, and he feared that petitioner would gloat about it on the stand. (R. 66). He did not believe that Burger's mother would be able to provide testimony sufficiently useful to warrant calling her to the stand. "[S]he could not add anything ... other than being a moth-

er and saying I don't want you to put my child in jail, or in the electric chair." (R. 68). He also feared that during cross-examination she would disclose unfavorable information about her son. *Id.*

In *Cape v. Francis*, 741 F.2d 1287 (11th Cir.1984), another Georgia state prisoner under sentence of death also sought habeas relief by alleging, *inter alia*, that he received ineffective assistance of counsel at the penalty stage of his trial.

The Eleventh Circuit did

[n]ot detect any semblance of ineffectual representation during the penalty stage of the trial to support Cape's charge that his lawyer did not present sufficient mitigating evidence. Counsel investigated potential mitigating evidence and presented that which he felt would reflect favorably to his client. The mere fact that other witnesses might have been available or that other testimony might have been elicited from those who testified is not sufficient ground to prove ineffectiveness of counsel.

*Id.* at 1301.

It is true Cape's counsel presented some mitigating evidence while in the instant case petitioner's counsel presented no mitigating evidence. It is also true, however, that Leaphart's conversations with Burger, Burger's mother and family friend, together with his study of psychologists' reports, indicated to him that further investigation

---

**3.** The obverse side of this coin was applied by the prosecutor in *Cape v. Francis*, 741 F.2d 1287, 1301 n. 15 (11th Cir.1984).

**4.** The psychologist on whom Leaphart relied indicated that he would not be able to provide helpful testimony. (R. 50–51). Moving the trial court for appointment of additional psychiatric study would have been counterproductive, according to Leaphart, because he believed that the state court would have sent his client to a state hospital—one which, according to Leaphart, had a reputation for producing reports favorable to the prosecution. (R. 51).

**5.** Q. Did you make any attempt to talk to the other people that he had lived with during his life?
A. I couldn't—didn't know who they were. I knew that [Burger] had been in wherever he had come from to go in the Army. He had

been—he had lived there. And, then his mother and father had separated at an early age as I recall. He was down in Florida for a while. Had gotten in some trouble down in Florida and then he went back up North where he lived and got in some trouble up there. And, then he ended up in the Army. And, very basically, I couldn't find anything in Mr. Burger's background which I felt would be helpful. You know, I could have put his mother up, I'm sure. And, she could have said some nice things about him. But, my feeling was that a lukewarm witness would have without any real thing to say would have possibly been harmful. And, I felt—I just decided not to do it.
(R. 38).

into this area would have been fruitless. Furthermore, and especially in light of his perception of Burger's personality, Leaphart, who had represented other death penalty defendants (R. 30, 58–59), feared opening the door to needless illumination of contrary character evidence by the prosecution on cross-examination. This Court's inquiry is therefore properly focused on the reasonableness of Leaphart's investigation and decision regarding this rejected strategy. In that regard,

> [s]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchangeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support *the limitations on investigation.* In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Washington,* 466 U.S. at ——, 104 S.Ct. at 2066, 80 L.Ed.2d at 695 (emphasis added). Further focusing on what "limitations on investigation" would be evaluated in assessing the reasonableness of an attorney's performance, the Supreme Court emphasized that

> [w]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions. See *United States v. DeCoster,* 624 F.2d [196] at 209–210 [ (D.C.Cir.1976) ].

*Washington,* 466 U.S. at ——, 104 S.Ct. at 2066–2067, 80 L.Ed.2d at 696.

Leaphart testified that Burger never gave him the names of any witnesses that might have been helpful to him at trial. (R. 63). Despite this, Leaphart did consult, as mentioned above, with Burger's mother and volunteer "big brother," (R. 77) and reviewed reports written by Burger's former psychologists. He was unable to unearth background information sufficiently helpful to warrant further investigation, nor to sway his decision not to emphasize petitioner's character at the second sentencing trial.

Petitioner Washington, like petitioner Burger, also confessed to, *inter alia,* his involvement in the crimes of kidnapping and murder. Unlike Burger, Washington had pleaded guilty and relied on an earlier plea colloquy with the sentencing judge, who had commended Washington for taking responsibility for his crimes. In both cases, however, defense counsel were faced with evidence of their clients' confessions, the overwhelming strength of the evidence against their clients and aggravating circumstances surrounding the crimes. In preparing for the sentencing hearing in *Washington,* counsel spoke with the defendant's

> wife and mother, though he did not follow up on the one unsuccessful effort to meet with them. He did not otherwise seek out character witnesses for respondent. [cit]. Nor did he request a psychiatric examination, since his conversations with his client gave no indication that respondent had psychological problems.

466 U.S. at ——, 104 S.Ct. at 2057, 80 L.Ed.2d at 684.

As in the instant case, Washington's "[c]ounsel decided to look no further for evidence concerning respondent's character and emotional state. That decision reflected [*inter alia,*] trial counsel's sense of hopelessness about overcoming the evidentiary effect of respondent's confessions to the gruesome crimes." *Id.* The Supreme Court concluded that "[t]rial counsel could reasonably surmise from his conversations with [his client] that character and psycho-

logical evidence would be of little help.... Restricting testimony on [Washington's] character to what had come in at the plea colloquy ensured that contrary character and psychological evidence and [Washington's] criminal history, which counsel had successfully moved to exclude, would not come in." 466 U.S. at ——, 104 S.Ct. at 2071, 80 L.Ed.2d at 701.[6] In addition, the mitigating evidence "[a]t most ... show[ed] that numerous people who knew [Washington] thought he was generally a good person and that a psychiatrist and a psychologist believed he was under considerable emotional stress that did not rise to a level of extreme disturbance." *Id.*

In the instant case, counsel was faced with evidence of not only Burger's signed, but sworn confession (Tr. 151–153), to participation in a gruesome crime. This evidence was bolstered by, *inter alia*, eyewitness and tangible evidence. The crime included petitioner's depraved act of asking the victim if he "was all right" before petitioner drowned him. Similar to the setting in *Washington*, counsel in the instant case was convinced from what he learned from his investigation that no productive result would obtain from further pursuing Burger's background, even in light of Leaphart's knowledge that Burger had come from a broken home, *see Griffin v. Wainwright*, 588 F.2d 1549, 1562 (M.D.Fla. 1984), and that emphasizing character evidence would be the wrong strategy to employ. This judgment is not unreasonable, especially in light of the fact that calling a character witness to the stand is not without risk; there are, almost invariably, unknown poisons to be hatched out of the mud by way of cross examination.[7] *See,*

6. Within specified limits, Georgia prosecutors are permitted at capital sentencing trials to place the defendant's character in issue through his prior record or other criminal acts. "All aspects of [a convicted felon's] crime or crimes, his character and his attitude are admissible, subject to the applicable rules of evidence regarding reliability, to guide the fact finder in determining appropriate sentence. *See Lockett v. Ohio*, 438 U.S. 586 [98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) ] [cits]; *Collier v. State*, [244 Ga. 553, 261 S.E.2d 364 (1979) ]." *Fair v. State*, 245 Ga. 868, 268 S.E.2d 316, *cert. denied*, 449 U.S. 986, 101 S.Ct. 407, 66 L.Ed.2d 250, *reh'g denied*, 449 U.S. 1104, 101 S.Ct. 903, 66 L.Ed.2d 831 (1980); O.C.G.A. § 17-10-2. This may include "[a]ny lawful evidence which tends to show the motive of the defendant, his lack of remorse, his general moral character, and his predisposition to commit other crimes ... subject to the notice provisions of the statute ... [it] may [also] consist ... of the defendant's attitude concerning his crime and the victim, the trier of fact's personal observation of the defendant, his conduct after incarceration and evidence of subsequent crimes." *Fair*, 245 Ga., at 873, 268 S.E.2d 316, quoted in *Zant v. Stephens*, 462 U.S. 862, —— n. 22; 103 S.Ct. 2733, 2748 n. 22, 77 L.Ed.2d 235, 256 n. 22 (1983); *see also id.*, 462 U.S. at ——, 103 S.Ct. at 2743, 77 L.Ed.2d at 251 ("But the Constitution does not require the jury to ignore ... possible aggravating factors [other than those specified in the sentencing statute] in the process of selecting ... those defendants who will actually be sentenced to death."); *Id.*, 462 U.S. at —— n. 17, 103 S.Ct. at 2743 n. 17, 77 L.Ed.2d, at 251 n. 17; *Godfrey v. Francis*, 251 Ga. 652, 660, 308 S.E.2d 806 (1983), *cert. denied,*

—— U.S. ——, 104 S.Ct. 1930, 80 L.Ed.2d 475 (1984).

However, bad character evidence can be admitted only "[w]hen the defendant ha[s] been notified prior to trial that such evidence w[ill] be presented." *Brown v. State*, 235 Ga. 644, 649, 220 S.E.2d 922 (1975). The evidence must be geared toward providing " '[a]n *individualized* determination on the basis of the character of the individual and the circumstances of the crime.' [*Stephens*, 103 S.Ct. at] 2744 (emphasis in original)." *Ritter v. Smith*, 726 F.2d 1505, 1515 (11th Cir.1984). In addition, the jury may not consider non-statutory aggravating circumstances unless it has found the existence of at least one statutory aggravating circumstance involved in the crime. *Stephens; Moore v. Zant*, 722 F.2d 640, 643–44 (11th Cir.1984); *see also McCleskey v. Zant*, 580 F.Supp. 338, 390 (N.D. Ga.1984). Such evidence must not be " 'constitutionally impermissible' or 'totally irrelevant to the sentencing process.' [*Stephens*, 103 S.Ct.] at 2747[.]" *Moore*, at 643. Furthermore, "[t]he defendant is accorded substantial latitude as to the types of evidence he may introduce." *Gregg v. Georgia*, 428 U.S. 153, 164, 96 S.Ct. 2909, 2921, 49 L.Ed.2d 859 (1976), citing *Brown; see also Raulerson v. Wainwright*, 732 F.2d 803 (11th Cir.1984).

Nevertheless, there is no suggestion that State prosecutors may not elicit further information damaging to the defendant when cross-examining character witnesses called by a defendant. *See, e.g., Knighton v. Maggio*, 740 F.2d 1344, 1348 (5th Cir.1984).

7. In an affidavit submitted to this Court, petitioner's uncle attests that petitioner came from

*e.g., Knighton v. Maggio,* 740 F.2d 1344, 1448 (5th Cir.1984) (defense counsel not ineffective when he made "the value judgment that the gain to be expected from the favorable testimony of family witnesses would not justify the risk of the potential harm from unfavorable testimony expected on cross-examination."). The reasonableness of the decision should be viewed not in hindsight, but primarily in light of the information supplied by the defendant. *Washington,* 466 U.S. at ——, 104 S.Ct. at 2067, 80 L.Ed.2d at 696.

In *Collins v. Francis,* 728 F.2d 1322 (11th Cir.1984), Collins contended that his

> counsel was ineffective because he failed to investigate for possible use at the sentencing phase of his trial any evidence of mitigating circumstances. [Collins] allege[d] that counsel failed to look into his character and the record and the background of his family. He also allege[d] that counsel failed to contact his relatives and friends regarding testimony they might have been able to give on the issues of guilt or punishment.

*Id.* at 1349.

Collins pointed to affidavits from friends who said they would have vouched for his good character at the trial. Collins' counsel stated "that Collins never gave him the names of such friends; consequently, he made no attempt to uncover any[,]" (*id.*) and the habeas court gave credence to counsel's testimony. The Eleventh Circuit

accepted this finding and this factor figured into its conclusion that Collins was not denied effective assistance of counsel.

In the instant case, this Court similarly finds that Burger did not provide his attorney with the names of those individuals apparently located by Mr. Leaphart's successors. It is true that petitioner's current attorneys were successful in finding other witnesses who could paint a tragic childhood background; it is also true that they were able to "elicit" a more compelling explanation of Burger's background from his mother than did Leaphart. (R. 74–87).[8] That post-death sentence attorneys with greater resources materialize to illuminate, through the use of hindsight, weaknesses in the strategy employed by pre-sentence attorneys equipped with comparatively fewer resources, was apparently recognized by the Supreme Court in *Washington,* when it emphasized that

> [j]udicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. *Cf. Engle v. Isaac,* 456 U.S. 107, 133–134, 71 L.Ed.2d 783, 102 S.Ct. 1558 [1574–1575] (1982).

a broken home and that he was unwanted by his parents. He opined that Burger had a split personality. "Sometimes [Burger] would be a nice, normal guy, then at times he would flip out and would get violent over nothing." Affidavit of Earnest R. Holtcsclaw at 1–2; *see also* Affidavit of Cathy Russell Ray at 1 ("He had a hairtrigger temper. He would get mad and punch the walls. Once he broke his knuckles he got so made."). On one hand, a jury could react with sympathy over the tragic childhood Burger endured. On the other hand, since Burger's sanity was not in issue in this case, the prosecution could use this same testimony, after pointing out.that petitioner was nevertheless responsible for his acts, to emphasize that it was this same unpredictable propensity for violence which played a prominent role in the death of Burger's victim. *See* note 6, *supra.* "[M]itigation ...," after all, [m]ay be in the eye of the

beholder." *Stanley v. Zant,* 697 F.2d 955, 969 & n. 11 (11th Cir.1983) (footnote omitted).

8. The *Collins* court also found significant the fact that counsel reasonably concluded that Collins' mother would not have made a favorable impact on the jury. In the instant case, Leaphart testified that after interviewing Burger's mother, he concluded that she would not have made any further impact on the jury except that degree of sympathy which might have been derived from her putative plea to the jury for mercy for her son. Furthermore, he did not deem it wise to risk possible negative consequences from using her testimony. The Court does not find credible her assertion, made in response to a question asked by a post-death sentence attorney, that Leaphart never asked her about Burger's background. (R. 76).

*Washington,* 466 U.S. at ——, 104 S.Ct. at 2065, 80 L.Ed.2d at 694; see also *Stanley v. Zant,* 697 F.2d 955, 964 n. 7, *reh'g denied,* 706 F.2d 318 (11th Cir.1983); *Williams v. Maggio,* 679 F.2d 381, 392 (5th Cir.1982) (en banc).

As mentioned above, courts must accord "a heavy measure of deference to counsel's judgments" 466 U.S. at ——, 104 S.Ct. at 2066, 80 L.Ed.2d at 695, and pay heed to those instances where the defendant "has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful[.]" *Id.,* 466 U.S. at ——, 104 S.Ct. at 2066, 80 L.Ed.2d at 696. In such instances, "[c]ounsel's failure to pursue those investigations may not later be challenged as unreasonable." *Id.* Indeed,

> in his argument to the jury at the sentencing hearing, [Burger's] lawyer made the strategic choice to focus on policy considerations against the imposition of the death penalty rather than call attention to the character of the petitioner. We cannot discredit counsel's trial tactics in pursuing this course, taking into consideration the overwhelming evidence of guilt and the bizzare nature of the crime.

*Cape v. Francis,* 741 F.2d at 1301.

As was the Eleventh Circuit in *Cape,* this Court is "[m]indful of the many obstacles and pitfalls that confront lawyers in the defense of capital murder cases. The responsibilities and pressures are awesome.

In retrospect, one may always identify shortcomings." *Id.*[9]

Indeed,

> [e]ffective counsel in a given case may consider the introduction of character evidence to be contrary to his client's interest. In other cases he may consider it unlikely to make much difference. In certain cases he may conclude that although available testimony might be minimally helpful, it would detract from the impact of another approach that he considers more promising ... [Counsel's] knowledge of local attitudes, his evaluation of the personality of the defendant and his judgment of the compatibility of the available testimony and the jury's impression of the defendant, his familiarity with the reactions of the trial judge under various circumstances, his evaluation of the particular jury, his sense of the 'chemistry' of the courtroom are just a few of the elusive, intangible factors that are not apparent to a reviewing court, but are considered by most effective counsel in making a variety of trial and pretrial decisions.

*Stanley v. Zant, supra,* 697 F.2d at 970.

In the instant case, it cannot be said that Leaphart's "[t]actical decision[ ] ... amount[s] to ineffective assistance[, as it is not] so ill-chosen as to render the trial fundamentally unfair. [*Washington,* 466 U.S. at ——, 104 S.Ct. at 2067, 80 L.Ed.2d at 696]." *Solomon v. Kemp, supra,* 735 F.2d at 402. Furthermore, " 'counsel for a criminal defendant is not required to pur-

---

9. See *Burger v. Zant,* 718 F.2d at 992–994 (Johnson, J. dissenting). In his dissent, Judge Johnson faulted Leaphart for "mak[ing] a decision not to offer any evidence in mitigation in order to preserve his right to opening and closing arguments." *Id.* at 992. Judge Johnson concluded that "the basic assumption on which this strategy was based is patently unreasonable[,]" (*id.*), since in the sentencing phase of the process there is no right of the defendant to open and close argument following the state's presentation of its evidence. O.C.G.A. § 17–10–2(a) & (c) (1982) (In the sentencing phase, "[t]he district attorney shall open and the defendant or his counsel shall conclude the argument."). With respect, this Court must disagree with Judge Johnson's conclusion. In response to questions aimed at illuminating Leaphart's over-

all knowledge and capabilities in handling criminal cases, Leaphart indicated that "[i]n the trial in the *original* [*i.e.,* guilt/innocent phase of the] case[,]" he felt that the presentation of witness testimony would not have been worth the loss of his ability to open and close during the final argument phase of the trial. (R. 67) (emphasis added). O.C.G.A. § 17–8–71 (1982) specifies that "[i]f the defendant introduces no evidence, his counsel shall open and conclude that argument to the jury after the evidence on the part of the state is closed." Where a defendant does present evidence, he loses his right to open and close. *See, e.g., Hubbard v. State,* 167 Ga.App. 32, 305 S.E.2d 849 (1983). In fairness to Judge Johnson, this Court recognizes that it incorrectly applied this distinction in its original Order. *See Blake v. Zant,* 513 F.Supp. at 798.

sue every path until it bears fruit or until all available hope withers.' *Lovett v. Florida,* 627 F.2d 706 (5th Cir.1980)." *Id.* This Court concludes that "[c]ounsel's strategy choice was well within the range of professionally reasonable judgments, and the decision not to seek more character ... evidence than was already in hand was likewise reasonable." *Washington,* 466 U.S. at ——, 104 S.Ct. at 2071, 80 L.Ed.2d at 701.

Because petitioner's showing is insufficient as to the performance prong of the *Washington* test, it is not necessary to address the prejudice prong. *Washington,* 466 U.S. at ——, 104 S.Ct. at 2071, 80 L.Ed.2d at 702 ("[f]ailure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim.").

Accordingly, petitioner's claim that his counsel was ineffective because he failed to present mitigating evidence at his second sentencing trial is DENIED. "[On this particular claim, petitioner] has made no showing that the justice of his sentence was rendered unreliable by a breakdown in the adversary process caused by deficiencies in counsel's assistance." *Id.*

### B. *Conflict of Interest*

Since an attorney's freedom from conflict of interest is an important consideration in any examination of his effectiveness (*see Burger v. Zant,* 718 F.2d at 987–991 (Johnson, J., dissenting), the Court will revisit its earlier conclusion. This claim is best analyzed by first examining what was and was not actually present in this litigation. As noted above, Burger and coindictee Stevens were tried separately. Each was represented by appointed counsel. Burger's counsel did employ a strategy adverse to Stevens' interests when he emphasized Stevens' greater culpability in the crime.

On the other hand, Stevens' counsel was also Leaphart's partner, Robert B. Smith. (R. 13–14). It is undisputed that the two lawyers made no attempt to construct a "Chinese Wall" between themselves. In fact, in varying degrees, they worked together on both cases at the trial and appellate levels. (R. 18, 40–41). Smith sat in with Leaphart on Burger's case, but Leaphart did not involve himself with Stevens' trial, which followed Burger's. (R. 18).

Leaphart was questioned on what effect, if any, his collaboration with Smith had on his resolve to represent Burger.

THE COURT: Did you pull any punches in order to protect Stevens?

A. No.

THE COURT: If crucifying Stevens would have helped Burger, would you have done it?

A. Yes, sir.

Q. Did you do it?

A. Didn't have the opportunity.

(R. 53).

As mentioned above, Leaphart did emphasize Stevens' greater culpability in the crime. He also investigated Stevens to ascertain what, if anything, might be useful to his defense of Burger. (R. 54). In addition, he constantly attempted to plea bargain with the prosecutor in the case. (R. 65). However,

A. [d]uring the first trial [the prosecutor] just flatly refused to even discuss it in any terms. And, then when we got it reversed on the sentence feature I continued to—in that time to try to negotiate with the—the district attorney about entering a plea, for Mr. Burger to serve a life sentence. And, he insisted on trying it and insisted on seeking the death penalty.

*Id.*

The prosecutor's flat refusal to engage in plea bargaining is not surprising when viewed in light of the strength of the case against Burger. As mentioned above, this evidence included Burger's signed, sworn confession (Tr. 151–153), which was coupled with a *Miranda* waiver (Tr. 201–203), along with eyewitness and tangible evidence. In addition, there is no suggestion that this evidence was not available to be used against Stevens. This background provides suitable perspective to the follow-

ing examination by petitioner's federal habeas attorney:

Q. Mr. Leaphart, did at any time during the representation did you talk to the District Attorney about the possibility of Mr. Leaphart (sic) testifying against Mr. Stevens?

A. You mean Mr. Burger?

Q. Mr. Burger, excuse me.

A. No.

Q. There was no discussion of his testimony in exchange for a lighter sentence for Mr. Burger?

A. No, sir.

(R. 38–39).

Since the prosecution "flatly refused to even discuss" plea bargaining, it follows that Leaphart would not have talked to the prosecutor about offering his client's testimony against Stevens.

Leaphart testified that at no time did he believe a conflict of interest to exist in the case during the trials and appeals. (R. 62). Finally, the conflict of interest issue was never raised at the trial level. (R. 15).

The standards for reviewing a conflict of interest claim are well settled.

> For a conflict of interest to cause representation to fail Sixth Amendment standards, the conflict must be actual, not speculative. *United States v. Alvarez,* 696 F.2d 1307, 1309 (11th Cir.1983), *cert. denied,* 461 U.S. 907, 103 S.Ct. 1878, 76 L.Ed.2d 809 (1983); *Baty v. Balkcom,* 661 F.2d 391, 395 (5th Cir. Unit B 1981), *cert. denied,* 456 U.S. 1011, 102 S.Ct. 2307, 73 L.Ed.2d 1308 (1982). Until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance. *Baty v. Balkcom, supra,* at 396.

*United States v. Ard,* 731 F.2d 718, 726–727 (11th Cir.1984); *Westbrook v. Zant,* 704 F.2d 1487, 1499 (11th Cir.1983); *United States v. Mers,* 701 F.2d 1321, 1328 (11th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 481, 78 L.Ed.2d 679 (1983); see also *Barham v. United States,* 724 F.2d 1529 (11th Cir.1984) (not all conflicts are so egregious as to constitute a Sixth Amendment claim). Judge Johnson stated that Leaphart and Smith acted as one attorney; that Leaphart in effect represented both Burger and Stevens. 718 F.2d at 988. Setting aside the fact that Burger and Stevens received separate trials, the Court turns to *United States v. Carr,* 740 F.2d 339 (5th Cir.1984), where the Fifth Circuit stated that

> "[a] conflict of interest is present whenever one defendant stands to gain significantly by counsel adducing probative evidence or advancing plausible arguments that are damaging to a codefendant whom counsel is also representing." [cits]. In assessing whether or not such conditions are present in a particular case the attorney representing both defendants "is in the best position professionally and ethically to determine when a conflict of interest exists...." *Cuyler* [*v. Sullivan*], 446 U.S. [335] at 347 [100 S.Ct. 1708, 1717, 64 L.Ed.2d 333] [cits].

740 F.2d at 348.

The mere fact that the attorneys assisted each other in Burger and Stevens' cases does not convince this Court that a conflict of interest has been shown. Although it may be said that the two attorneys at times acted as one while each prepared for trial and appeal, any inducement of Leaphart to actively represent conflicting interests— "to pull any punches" in his representation of Burger—would be at best speculative, not actual. There has been no showing that Leaphart "made a choice between possible alternative courses of action, such as eliciting (or failing to elicit) evidence helpful to one client but harmful to the other." *Mers,* 701 F.2d at 1328. In fact, Leaphart testified that he neither felt nor recognized the existence of a conflict of interest when he represented Burger. (R. 62). Nor can it be said that the overlap of counsel, to the extent it existed, infected Leaphart's representation so as to constitute an "active representation of conflicting interests." *Cuyler v. Sullivan,* 446 U.S. 335, 350, 100 S.Ct. 1708, 1719, 64 L.Ed.2d 333 (1980).

Accordingly, the Court affirms its earlier conclusion that petitioner is not entitled to relief on this ground.

To summarize, petitioner's claim that his attorney provided ineffective assistance of counsel at the second sentencing trial in this case is without merit. In addition, no conflict of interest on the part of his attorney has been shown.

SO ORDERED, this 10 day of October, 1984.

/s/ B. Avant Edenfield
JUDGE, UNITED STATES
DISTRICT COURT
SOUTHERN DISTRICT
OF GEORGIA

JOHNSON, Circuit Judge, dissenting:

I dissent from the majority's adoption of the district court order denying Burger's claim that he was deprived of effective assistance of counsel. A review of the record reveals that Burger was denied the effective assistance of counsel by both his appointed counsel's active representation of his co-indictee's conflicting interest and his counsel's failure to present any evidence on his behalf at either of his two sentencing proceedings.

The general principles applicable to ineffective assistance of counsel claims were articulated in *Strickland v. Washington,* — U.S. ——, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *See also King v. Strickland,* 748 F.2d 1462 (11th Cir.1984). To demonstrate that the assistance provided by counsel was so deficient as to require reversal, a defendant must make a two-pronged showing. First, he must demonstrate that his counsel made errors so serious that he was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Id.* at 2064. Such errors must be outside the generous range given to "reasonable professional judgment." *Id.* at 2066. Second, the defendant must demonstrate that he was prejudiced by the deficient performance. To meet this portion of his burden, defendant must show that there is a rea-

sonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 2068. A court reviewing an ineffective assistance claim, however, must bear in mind that

the ultimate focus of inquiry must be on the fundamental fairness of the proceeding. In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system relies on to produce just results.

*Id.* at 2069.

The Court in *Strickland v. Washington* also considered the showing that is required when a defendant argues that counsel was ineffective by reason of conflict of interest.[1] Where counsel breaches the duty of loyalty to his client, a limited presumption of prejudice applies. *Strickland v. Washington, supra,* 104 S.Ct. at 2067; *Cuyler v. Sullivan,* 446 U.S. 335, 345–350, 100 S.Ct. 1708, 1716–1719, 64 L.Ed.2d 333 (1980). Prejudice is presumed if the defendant can demonstrate that counsel "actively represented conflicting interests" and "that an actual conflict of interest adversely affected his lawyer's performance." *Strickland v. Washington, supra,* 104 S.Ct. at 2067; *Cuyler v. Sullivan, supra,* 446 U.S. at 350, 348, 100 S.Ct. at 1719, 1718.

Turning first to Burger's conflict of interest claim, the record is clear that Burger's counsel actively represented both Burger and Stevens. Both Burger and Stevens were charged with and indicted for the murder of Roger Honeycutt. Both were appointed counsel by the trial court at approximately the same time. Burger's appointed counsel, Leaphart, and Stevens' appointed counsel, Smith, were partners in a two-partner law firm. At the federal habeas hearing, Leaphart testified that he inter-

---

**1.** The Sixth Amendment guarantee of effective assistance of counsel necessarily includes the guarantee of conflict-free counsel. *Glasser v.*

*United States,* 315 U.S. 60, 70, 62 S.Ct. 457, 464, 86 L.Ed. 680 (1942); *United States v. Alvarez,* 580 F.2d 1251, 1254 (5th Cir.1978).

viewed both Burger and Stevens. Leaphart also testified that he assisted Smith in the preparation of Stevens' case and that Smith assisted him in the preparation of Burger's case. Both lawyers discussed the issues involved in each case and researched the law together.[2] Smith and Leaphart collaborated in preparing the briefs for both Burger and Stevens on each defendant's first appeal to the Supreme Court of Georgia; Leaphart testified that he "primarily" prepared the briefs for Burger and Stevens on the second appeal to the Supreme Court of Georgia.[3] The fee received by each attorney for representing each client was deposited in the law firm's corporate account. At no time in his representation of Burger did Leaphart or the trial court ever inform Burger of a possible conflict of interest.

Whether analyzed as a situation where one attorney, Leaphart, represented both Burger and Stevens,[4] or where one law firm represented both Burger and Stevens,[5] the end result was that Leaphart was actively involved in the defense of both to the extent that a conflict of interest was clearly established.

Although multiple representation is the paradigm context in which conflict of interest claims arise,[6] a finding of multiple representation alone does not establish ineffective assistance of counsel. The conflict must be shown to be actual, not merely speculative, before representation will violate Sixth Amendment standards. *Baty v. Balkcom*, 661 F.2d 391, 397 (5th Cir. Unit B 1981). "An actual conflict of interest occurs when a defense attorney places himself in a situation 'inherently conducive to divided loyalties.'" *Zuck v. Alabama*, 588

2. Transcript of Federal Habeas Corpus Hearing ("THC") at 18.

3. THC at 40–41.

4. The warden-appellant argues that the conflict of interest cases relied upon by Burger are inapposite as involving the representation of multiple defendants by one attorney. Here, appellant contends, Burger and Stevens were represented by "separate" attorneys. This argument is contrary to the facts as reflected by the record. Leaving aside the fact that Leaphart and Smith were partners in the practice of law, the attorneys here were each active in the defense of the other's client and "seem to have viewed themselves as a defense 'team' acting on behalf of [both] of the accused." *United States ex rel. Sullivan v. Cuyler*, 593 F.2d 512, 515 (3d Cir. 1979), *rev'd on other grounds, Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). Leaphart consulted confidentially with Stevens, aided in preparing his case for trial, and prepared the briefs for both of his appeals. "Whatever may have been the extent of each attorney's participation in the trial of the ... defendants, we are satisfied that it was sufficient to establish that both attorneys represented [both] defendants." *Id.*

5. "The same principles [governing Sixth Amendment conflict of interest claims] apply where the joint representation is by two members of the same firm." *Ross v. Heyne*, 638 F.2d 979, 983 (7th Cir.1980) (*quoting United States v. Helton*, 471 F.Supp. 397, 399 n. 1 (S.D.N.Y.1979)); *see also United States v. Donahue*, 560 F.2d 1039, 1042 (1st Cir.1977) ("[t]he same rule applies with equal force to representation of two or

more defendants by members of the same law firm."). *Cf. Zuck v. Alabama*, 588 F.2d 436, 438 (5th Cir.1979) (ineffective assistance found where "[t]he law firm which served as counsel to Zuck in his murder trial also represented, in an unrelated civil matter, the state prosecutor who tried Zuck."); Fed.R.Crim.Pro. 44(c) ("[w]henever two or more defendants have been jointly charged ... and are represented by ... retained or appointed counsel who are associated in the practice of law, the court shall promptly inquire with respect to such joint representation and shall personally advise each defendant of his right to the effective assistance of counsel, including separate representation."), *construed in Ross v. Heyne*, 638 F.2d at 983 ("[t]he Supreme Court's proposal of this rule indicates its recognition that the potential constitutional problems attendant to multiple representation are present when different attorneys from the same legal partnership represent co-defendants with conflicting interests."); *ABA Code of Professional Responsibility* DR 5–105(d). Further, the Supreme Court of Georgia, exercising its supervisory role over the Bar, has adopted a mandatory rule in death penalty cases that co-defendants must be provided with separate and independent counsel. *Fleming v. State*, 264 Ga. 90, 270 S.E.2d 185 (1980). This rule applies with equal force to representation by a single attorney or by members of the same law firm. *Id.* at 188 n. 7.

6. *See Cuyler v. Sullivan*, 446 U.S. at 348, 100 S.Ct. at 1718 ("[a] possible conflict of interest inheres in almost every instance of multiple representation"); *United States v. Alvarez*, 580 F.2d 1251, 1254 (5th Cir.1978).

F.2d 436, 439 (5th Cir.1979) (*quoting Castillo v. Estelle,* 504 F.2d 1243, 1245 (5th Cir.1974)); *see also Baty v. Balkcom, supra,* 661 F.2d at 397 ("[a]n actual conflict of interest exists if counsel's introduction of probative evidence or plausible arguments that would significantly benefit one defendant would damage the defense of another whom the same counsel is representing.").

In this case the fundamental issue framed by counsel was not Burger's guilt but the extent of his culpability. At the habeas corpus hearing, Leaphart exhaustively reviewed the evidence that the extent of Burger's culpability was less than that of Stevens.[7] In sum, this evidence was as follows. At the time the crime was committed, Burger was seventeen; Stevens was twenty. Burger has an I.Q. of 82 and possible brain damage. Stevens appeared to be the leader in their relationship; Burger was the follower. Stevens planned and initiated the robbery of the victim; Burger followed his instructions. Stevens actually committed the robbery; Stevens made the victim undress; Stevens forced the victim to perform oral sodomy on Stevens; Stevens anally sodomized the victim; Stevens tied the victim up and forced him to get in the trunk of the cab. Stevens told Burger they would have to kill him; Burger said he didn't want to kill him. Stevens told Burger they would have to get rid of the cab by driving it into the pond; Stevens ordered Burger to drive the cab with the victim locked in the trunk into the pond. Burger drove the cab and the victim into the pond. In short, the essence of Burger's defense was that he was less culpable than Stevens.

In this situation, any evidence or arguments made by counsel in Burger's behalf would, by the very nature of Burger's defense, damage Stevens. Such adversity in the interests of Leaphart's clients demonstrates that an actual conflict of interest existed. *See Zuck v. Alabama, supra,* 588 F.2d at 439 (adversity sufficient to demonstrate actual conflict of interest exists if "the attorney owes a duty to the defendant to take some action that could be detrimental to his other client").

The evidence provided by petitioner also demonstrates that this conflict "adversely affected his lawyer's performance." *Strickland v. Washington, supra,* 104 S.Ct. at 2052. On several occasions, Leaphart refrained from taking actions in support of Burger that would have been detrimental to Stevens. For example, at no time in his representation of Burger did Leaphart offer Burger's testimony against Stevens in exchange for a sentence less than the death penalty for Burger.[8] *See Baty v. Balkcom, supra,* 661 F.2d at 397 N. 12 ("[p]lea bargains are perhaps the most obvious example of the manifest effects of a conflict of interest at pretrial proceedings."); *see also Fleming v. State,* 246 Ga. 90, 270 S.E.2d 185, 189 (Bowles, J., concurring) ("[n]o two defendants share equal responsibility for a crime. Usually one is more culpable than the other or for any number of reasons has a greater degree of responsibility for what occurred. One may also be more entitled to leniency based on such factors as age, intelligence, motive, background, previous conduct or

---

**7.** THC at 20–23.

**8.** At the federal habeas hearing, Leaphart testified that he had not, at any time during his representation of Burger, discussed with the district attorney the possibility of Burger's testifying against Stevens in return for a lighter sentence. THC at 38–39. When further questioned about plea negotiations in Burger's case, Leaphart testified that he had engaged in plea negotiations, but that *"during the first trial* [the district attorney] refused to discuss it in any terms." THC at 65 (emphasis supplied). From this account, it appears that plea negotiations were entered into in this case; that Leaphart never offered Burger's testimony against Stevens; and that, after Burger's first trial had begun, the district attorney refused to discuss a plea on whatever terms Leaphart had offered, presumably not the terms of Burger's testifying against Stevens since Leaphart testified he did not at any time make such an offer. Thus, appellant's argument that no *pretrial* conflict of interest could have arisen due to the district attorney's refusal to plea bargain is contradicted by the record.

record, etc. Common counsel eliminates any practical possibility of plea bargaining."). The district attorney's disinclination to plea bargain did not stop Leaphart from "constantly attempting" to bargain for a life sentence; there is no reason why it should have deterred him from making the more attractive offer of Burger's testimony against Stevens. Moreover, at Burger's trial Stevens was not called as a witness by the defense. Finally, Leaphart prepared the briefs for both Burger and Stevens on each defendant's second appeal to the Supreme Court of Georgia. In Burger's brief, Leaphart does not argue that he was the less culpable party, although the scope of the Supreme Court of Georgia's appellate review in capital cases includes a consideration of whether the "sentence of death is excessive or disproportionate to the penalty in similar cases, considering both the crime and the defendant." O.C.G.A. 17–10–35(c)(3) (1982), formerly Ga.Code Ann. 27–2537(c)(3) (1933).

Once a defendant has made the two showings required by *Strickland v. Washington, supra,* prejudice is presumed. 104 S.Ct. at 2067. *See also Westbrook v. Zant,* 704 F.2d 1487, 1499 (11th Cir.1983); *Baty v. Balkcom, supra,* 661 F.2d at 395 ("when counsel is confronted with an actual conflict of interest, prejudice must be presumed, and except under the most extraordinary circumstances, the error cannot be considered harmless") (*quoting Turnquest v. Wainwright,* 651 F.2d 331, 334 (5th Cir. 1981)). Even accepting the district court's finding, adopted by the majority in this case, that Leaphart did not "tailor[ ] his [trial] strategy toward protecting Stevens," there is sufficient evidence of an actual conflict and of tangible adverse effect on Leaphart's performance to establish a Sixth Amendment violation.[9]

Burger also argues that he was denied the effective assistance of counsel because

Leaphart failed adequately to investigate possible mitigating evidence or to present *any* evidence, in mitigation or otherwise, at either of his two sentencing proceedings. Counsel's duty of effective representation continues into the sentencing phase of his client. *See Stanley v. Zant,* 697 F.2d 955, 963 (11th Cir.1983) ("The special importance of the capital sentencing proceeding gives rise to a duty on the part of defense counsel to be prepared for that crucial phase of the trial."). At the core of the duty of effective representation is the "independent duty to investigate and prepare." *Goodwin v. Balkcom,* 684 F.2d 794, 805 (11th Cir.1982). To fulfill this obligation, counsel must make reasonable investigations or make a reasonable decision that makes further investigation unnecessary. *Strickland v. Washington,* 104 S.Ct. at 2066. An examination of the relevant facts suggests that Leaphart failed in both his duty of investigation and his duty of representation at the sentencing proceeding.

The district court found that Leaphart's investigation into available mitigating evidence consisted solely of conversations with Burger's mother and an attorney who had befriended her. Although the content of those conversations and the identity of possible character witnesses were not clear, the district court concluded that Leaphart made "adequate if hardly ideal inquiries" and that his "investigation appears to meet at least minimal professional standards." Such an investigation should not be characterized as reasonable or substantial. Moreover, even the scant amount of information which was unearthed through Leaphart's investigation was not presented in the proceeding itself. Nor can it be said that Leaphart's choice to curtail investigation and to present no evidence at the sentencing proceedings was a reasonable strategic decision based on reasonable

9. The district court appears to take the position that it would not be possible to make a full demonstration of prejudice of the type, for example, that is required for general ineffective assistance claims under *Strickland v. Washington.* Whether or not such a showing would

be possible is not relevant, however, to the issue of conflict of interest. In conflict of interest cases, as noted above, a limited presumption applies on a showing of some "adverse effect" on the lawyer's performance, which has been amply demonstrated in the instant case.

assumptions. Leaphart has attempted to justify his approach by reference to three strategies or assumptions: 1) that Leaphart's theory of defense, or strategy, was to make the state prove its case; 2) that, if mitigating evidence had been offered at Burger's sentencing proceedings, Leaphart would have lost the right to opening and closing argument; and 3) that Leaphart chose to rely in closing on the argument that Burger had never been in trouble before, which would have been undercut by an investigation into and testimony concerning Burger's background. Even conceding that broad range must be given to the operation of professional judgment, *Strickland v. Washington,* 104 S.Ct. at 2065–66, none of these strategies or assumptions withstand scrutiny for reasonableness.

Leaphart testified concerning his strategy or theory of defense in Burger's case:

> Well, of course, my theory of defense was of course trying to make the District attorney prove his case. And my theory of defense was to—well, that in effect in essence what it was. And, use whatever rules of evidence and to prevent him from doing so.[10]

And, specifically concerning the second trial solely on the issue of penalty, Leaphart again testified that he "felt that case should have been tried on the facts and make the District Attorney—I say make him, use whatever rules of evidence to exclude those harmful facts." [11] The law provides that the state must prove its case, whether defense counsel is present or not. Relying on the state's case is not a "strategy" for the defense, but rather reflects an abandonment of counsel's obligation to develop a case for his client. This proffered strategy is tantamount to no strategy at all; and reliance on such a strategy in a capital sentencing proceeding, as an alternative to investigating and presenting available mitigating evidence, is patently unreasonable.

Second, Leaphart testified that he made a decision not to offer any evidence in mitigation in order to preserve his right to opening and closing arguments. Again, the basic assumption on which this strategy was based is patently unreasonable. O.C.G.A. 17–10–2(a) & (c) (1982), formerly Ga.Code Ann. 27–2503(a) & (c) (1933), provide for the conduct of sentencing proceedings in capital cases: "The district attorney shall open and the defendant or his counsel shall conclude the argument." The presentation of evidence by the defendant at a capital sentencing proceeding in no way affects this division of argument between the state and the defense. In fact, this procedure was followed at Burger's sentencing proceedings: the district attorney opened and the defense closed final arguments to the jury. Leaphart simply failed to inform himself of basic Georgia criminal procedure in sentencing proceedings. *Cf. Young v. Zant,* 677 F.2d 792 (11th Cir. 1982). No strategy based on such a false assumption is reasonable. The district court clearly erred in concluding otherwise.[12]

The district court also found that Leaphart's failure to substantially investigate mitigating evidence was based on a strategic choice to rely in closing argument on the "major argument" in Burger's behalf that he had no prior record of violent crime and had never been in trouble before. As it relates to Burger's second sentencing proceeding, this finding is contradicted by the record: at no point in his closing argument did Leaphart mention the lack of evidence that Burger had a record or had been in trouble before. Instead, Leaphart's closing argument at the second sentencing proceeding stressed Burger's comparative lack of culpability and asked for the jury's mercy. This argument would not have been

---

10. THC at 18.

11. THC at 52.

12. The district court's explanation that Leaphart's rationale was appropriate in the context of the culpability trial provides no justification for its application in the context of a sentencing proceeding where, as noted above, the Georgia procedural rules are different.

undercut by the presentation of humanizing evidence concerning Burger's background.

In short, Leaphart's decision neither to conduct substantial investigation nor to present any evidence at the sentencing proceedings was not a reasonable strategic choice. It was, moreover, readily distinguishable from the choices made by attorneys in those cases relied upon by the district court. In *Cape v. Francis*, 741 F.2d 1287 (11th Cir.), the district court found that petitioner's attorney presented some mitigating evidence during the sentencing proceeding; and in *Strickland v. Washington, supra,* petitioner's attorney relied on character testimony that had come in at an earlier plea colloquoy. 104 S.Ct. at 2071. Leaphart's presentation of no evidence in the instant case is different; it represented an error "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland v. Washington, supra,* 104 S.Ct. at 2064.

But the Sixth Amendment inquiry does not end with a finding of unreasonable performance by counsel. Burger may prevail only if he shows both a denial of effective assistance and actual prejudice to the course of his defense. *Id.* In this case, however, prejudice is apparent.

At the federal habeas hearing, Burger offered the testimony of his mother and numerous affidavits concerning his troubled childhood and background. This evidence demonstrated that Burger's parents had been married when his mother was fourteen and his father was sixteen. His parents divorced when he was a child. Neither parent wanted Burger and his childhood was spent being shuffled between the two. His father threw him out of the house; his mother sent him back to live with his father. Burger's mother remarried. Burger's stepfather beat Burger, and beat Burger's mother in his presence; Burger's stepfather involved him in drugs and alcohol when he was eleven years old. Burger's mother and stepfather moved from Indiana to Florida. Burger was sent to live with his father. Burger's father beat him and refused to have anything to do with him. Burger ran away and hitchhiked to Florida to live with his mother, selling his shoes to buy food along the way. When Burger arrived barefoot in Florida, his stepfather told him he could not stay with them. Burger's mother told juvenile authorities that she didn't want him, and to send him back to his father in Indiana. When Burger arrived in Indiana, his father locked him out of the house. Burger was taken in by a neighbor, as he had nowhere else to go. The clinical psychologist who examined Burger testified at a motion hearing that Burger had an I.Q. of 82 and possible brain damage.

I cannot accept the holding that the failure to present this evidence was not prejudicial to Burger. The district court found that, although the affidavits of the character witnesses supplied by Burger at the hearing do "contain references to a difficult childhood which might have created some sympathy for Mr. Burger," they also contained references to drug abuse, juvenile probation and violence. However, the thrust of the character testimony offered by Burger was not that Burger was a model citizen, but that Burger's personality and motivation could be explained by his unusually stormy childhood. Although this is precisely the kind of humanizing evidence that "may make a critical difference, especially in a capital case," *Stanley v. Zant, supra,* 697 F.2d at 969, Leaphart elected neither to conduct further investigation nor to use the evidence at the sentencing proceeding. Having heard the state's case, unmitigated by any evidence presented on behalf of petitioner, two sentencing juries recommended the death penalty.

Failure to present this substantial, available mitigating evidence meets the prejudice prong of *Strickland v. Washington, supra.* In fact Leaphart's failure to investigate or to present evidence on his client's behalf is an apt example of the kind of "breakdown in the adversarial process," *id.*

at 2069, that requires a reviewing court to find the results of a proceeding unreliable.

For these reasons, I would reverse the district court's finding that Burger was afforded the effective assistance of counsel during his state court proceedings and remand this case with directions to grant the writ.